UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
AUBREY HENRY, LLOYDA HENRY, [1]  and
KAREN JEMMOTT,

              Plaintiffs,

     - against -

LUCKY STRIKE ENTERTAINMENT, LLC,
JAVIER CACERES, RICHARD VAN LEUVEN,
and JOHN DOES 1–5,

              Defendants.
----------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

**MEMORANDUM & ORDER**
10-CV-03682 (RRM) (MDG)

      Plaintiffs, African Americans who sought to patronize defendants' bowling alley, claim

that defendants discriminated against them on the basis of their race in violation of state and

federal law when defendants refused plaintiff Aubrey Henry admission to the bowling alley.

Defendants now move for summary judgment, arguing that they did not discriminate on the basis

of race, and that Mr. Henry was instead denied admission because his clothing did not comport

with Lucky Strike's dress code.  For the reasons below, defendants' motion is GRANTED IN

PART and DENIED IN PART.

## FACTUAL BACKGROUND[2]

      Plaintiff Karen Jemmott arranged with defendant Lucky Strike, a bowling alley and

evening lounge, to hold her birthday celebration at Lucky Strike's Manhattan location.  To that

end, Jemmott signed a contract (the "event order") reserving a bowling lane for six guests on

---

[1] In their filings, plaintiffs Aubrey and Lloyda Henry have used inconsistent spellings for their last names ("Henry" and "Henrey").  Because plaintiffs most consistently refer to both by the last name "Henry," the Court uses that spelling.
[2] The following discussion is taken from the evidence presented on summary judgment construed in the light most favorable to the nonmovant – here, plaintiffs.  The Court has drawn all reasonable inferences in plaintiffs' favor, and has noted disputed issues of fact.

February 27, 2010 from 10:00 P.M. to 12:00 A.M.  (Defs.' 56.1 (Doc. No. 25-1) at ¶¶ 1, 5, 6.)

The event order indicates that Lucky Strike has a dress code that is strictly enforced, and that

"[t]he following are not permitted:

> – Athletic wear, sweats, or sports jerseys
> – MC colors
> – Excessively baggy clothing
> – Sleeveless T-shirts
> – Plain white T-shirts
> – Construction boots
> – Headgear
> – Chains
> – Ripped or soiled clothing[.]"

(Event Order (Doc. No. 25 Ex. E) at 2.)  Jemmott paid Lucky Strike $200 to hold the event.

(Defs.' & Pls.' 56.1 (Doc. No. 27) at ¶ 6.)  Jemmott invited to the birthday party her friend

Lloyda Henry and Lloyda's husband Aubrey Henry, a New York City Police Detective, and

informed the Henrys that Lucky Strike had a dress code, but did not specifically indicate what

the dress code permitted or prohibited.  (Jemmott Dep. (Doc. No. 25 Ex. F) at 30–31; Lloyda

Henry Dep. (Doc. No. 29 Ex. EE) at 9.)

On the night of February 27, 2010, the Henrys drove their car to the party and parked on

the street, down the block from Lucky Strike.  The parties dispute how Mr. Henry was dressed.

According to plaintiffs, Mr. Henry was wearing fitted blue jeans, a blue-and-white striped

button-down shirt, a black leather blazer, and black Nike ACG footwear.[3]  (Defs.' 56.1 at ¶ 13;

Aubrey Henry Dep. (Doc. No. 25 Ex. G) at 22; Lloyda Henry Dep. at 16.)  Defendants presented

testimony that Mr. Henry's jeans and jacket were loose-fitting, and that he was also wearing a

baseball cap.  (Richard Van Leuven Dep. (Doc. No. 25 Ex. D) at 78–82.)  It had snowed the

---

[3] The record is unclear as to a precise description of Nike ACG footwear – for example, whether they are high or low cut, the type of sole, lace or slip-on, etc. – and if multiple styles, what particular  one Mr. Henry was allegedly wearing.   In addition, there are disputes throughout the record as to whether the shoes Mr. Henry was wearing can be characterized as "construction boots," "sneakers," or some other type of footwear.

previous night, and between six inches and a foot of snow remained on the ground.  (*See* Doc. No. 16 Ex. C.)

When the Henrys arrived at the entrance to Lucky Strike, they encountered Robert Beauford, an African American doorman employed by Lucky Strike.  When the Henrys approached to within five feet of the door of Lucky Strike, Beauford told Mr. Henry that he could not enter Lucky Strike with the shoes he was wearing.  (Aubrey Henry Dep. at 27–28.) Beauford testified "I recall this gentleman coming up . . . he came up to me, and I told the gentleman about the dress code."  (Beauford Dep. (Doc. No. 25 Ex. I) at 14.)  Beauford decided not to permit Mr. Henry to enter because "no ACG's, no Tims,[4] no construction boots" were allowed under the dress code.  (*Id.*)  Without responding to Beauford, the Henrys turned around and walked back to their car.  (Aubrey Henry Dep. at 28.)  Beauford did not say anything to Mrs. Henry at this time (*id.*), and it was Mrs. Henry's understanding that she would have been allowed inside Lucky Strike had she desired to enter.  (Lloyda Henry Dep. at 15.)

After returning to the car, the Henrys called Jemmott, who was at another bar with her boyfriend Michael McKinney.  The Henrys explained that Lucky Strike would not permit Mr. Henry to enter because of his footwear, and Jemmott indicated that she would speak with Lucky Strike about the issue.  (Lloyda Henry Dep. at 15–16.)  Jemmott called Lucky Strike and notified them of the situation, was told that the floor manager Javier Caceres would greet the Henrys at the door, and relayed this information to the Henrys.  (Jemmott Dep. at 48, 53, 56; Aubrey Henry Dep. at 31.)

The Henrys returned to Lucky Strike and met Caceres outside the front door.  Caceres indicated that Mr. Henry could not come in because his shoes were construction-type boots,

---

[4] "Tims" presumably refers to Timberland brand boots.  (*See* Van Leuven Dep. at 67.)

which the dress code prohibited.  (Javier Caceres Dep. (Doc. No. 25 Ex. K) at 34.)  Mr. Henry

challenged this characterization of his shoes, insisting that they were ACG sneakers rather than

construction-type boots, but Caceres maintained that ACGs were boots and refused to admit Mr.

Henry.  The Henrys returned to their car for a second time, where they called Jemmott and

informed her that the manager had also denied Mr. Henry admission.  (Aubrey Henry Dep. at

35–37.)

       Jemmott and McKinney arrived at Lucky Strike at around 10:00 pm and entered with no

issue.  (Jemmott Dep. at 42, 44, 61.)  Upon entering Lucky Strike, Jemmott and McKinney asked

to speak with Caceres.  They explained to him that that ACGs were not specifically prohibited by

the dress code that was attached to the event order and that, in any event, there had been a

snowstorm the day before and Mr. Henry would change into bowling shoes as soon as he entered

Lucky Strike.  (Jemmott Dep. at 58, 62–63.)  Caceres maintained that ACGs were not allowed

under Lucky Strike's dress code.  (*Id.* at 64–65.)

       During this conversation, McKinney stopped Richard Van Leuven, the general manager

of Lucky Strike (Van Leuven Dep. at 5), and informed him that a member of their party, who

was a New York City police detective, was being denied entrance because of his clothing.  Van

Leuven indicated that he would call Lucky Strike's corporate office and determine whether they

could allow Mr. Henry in to Lucky Strike.  (Lloyda Henry Dep. at 32; Jemmott Dep. at 66.)  It is

not clear from the record evidence whether Van Leuven ever placed this call.

       While Jemmott and McKinney were speaking with Caceres and Van Leuven, the Henrys

returned to Lucky Strike for a third time.  At the door, Aubrey Henry asked if his wife could

enter Lucky Strike to get out of the cold, and Mrs. Henry was allowed inside.  (Lloyda Henry

Dep. at 31–32.)  Van Leuven went outside and spoke with Mr. Henry.  According to Mr. Henry's

account, Van Leuven asked about Mr. Henry's employment as an NYPD detective, indicated that he was himself a retired police sergeant, and told Mr. Henry that he would go inside and call Lucky Strike's corporate office to try and resolve the situation.  (Aubrey Henry Dep. at 41.)  Van Leuven's testimony sharply contradicts that of Mr. Henry.  Van Leuven testified that he went outside and saw that Mr. Henry was wearing a baseball hat, his jeans and jacket were baggy and not neat-fitted, and he was wearing construction boots.  Van Leuven testified that any one of these dress code violations would have prohibited Mr. Henry from entering Lucky Strike.  (Van Leuven Dep. at 78–82.)

While Mr. Henry waited outside Lucky Strike, he observed white male patrons wearing construction-type boots being admitted to Lucky Strike.  He did not see anyone wearing ACGs being admitted, although he noticed that at least two of the door staff wearing ACGs.  (Aubrey Henry Dep. at 43–49.)  When Henry pointed out those patrons' footwear to a member of the door staff, he was told "don't worry about them.  You're not getting in."  (*Id.* at 48.)

Inside, Van Leuven again encountered Jemmott, McKinney, and Lloyda Henry.  Around this time, Jemmott and Lloyda Henry began noticing white patrons entering Lucky Strike wearing construction boots, which were clearly prohibited by the dress code.  Specifically, Jemmott testified that she saw at least two white males enter Lucky Strike wearing construction boots, and a female of unspecified race who was wearing sweats (also prohibited by the dress code) and had on snow boots that went up to her knee.  (Jemmott Dep. at 66–68.)  Jemmott took two pictures on her cell phone of the boots that the white patrons were wearing.  (*Id.* at 68–69; *see* Karen Jemmott Cell Phone Photos (Doc. No. 25 Ex. P).)  Jemmott later encountered another African-American couple who earlier in the night had been denied admittance to Lucky Strike because of their footwear, and had bought new shoes solely to gain admittance.  (*Id.* at 87.)

At this point, Jemmott admits that she "lost it," and grabbed Van Leuven's hand and began yelling about the fact that white patrons with construction boots were being admitted. (*Id.*)  Van Leuven informed Jemmott that he would not discuss the matter further, but that she was free to stay and enjoy her event with her guests.  (Van Leuven Dep. at 82.)  After it became clear that Lucky Strike would not admit Mr. Henry, both Mr. and Mrs. Henry left and went to a nearby lounge for several hours, and then went home.  (Jemmott Dep. at 82; Aubrey Henry Dep. at 58.)

After the Henrys left, Jemmott returned to her reserved bowling lane, and she and her other guests went on with the birthday party.  (Jemmott Dep. at 82.)  Jemmott's other guests, all of whom were African American, were admitted into Lucky Strike without issue.  (Pls.' Resp. to Interrogatory No. 11 (Doc. No. 25 Ex. L) at ¶ 11; Jemmott Dep. at 61–62.)  When Lucky Strike shut down Jemmott's lane at midnight pursuant to the event order, Jemmott complained that she had spent the first hour of the party trying to have her friend admitted, at which point Lucky Strike gave her another hour on the lane.  (*Id.* at 63–70; 82–85.)  At no time during the evening did any Lucky Strike employee say anything to Jemmott that she perceived as racist or inappropriate in any way.  (*Id.* at 101.)  Jemmott and her guests left Lucky Strike at around 1:00 a.m.  (*Id.* at 82.)

Following the birthday party, Jemmott sent certain information regarding the above events to various media outlets, and was interviewed by a television news station.  (Jemmott Dep. at 123–24.)  Jemmott also forwarded this information to Lucky Strike and requested an apology for the embarrassment they caused to Jemmott and the Henrys.  (*Id.*)  In an email, Lucky Strike's Director of Marketing apologized to both Jemmott and Mr. Henry, and invited them to return to Lucky Strike as her guests.  (Email exchange between Jen Perrymore, Karen Jemmott,

and Aubrey Henry (Doc. No. 25 Ex. M).)  The Henrys have not returned to Lucky Strike since

the night of the party.  (Aubrey Henry Dep. at 58.)  Mr. Henry testified that he would never

return to Lucky Strike.  (*Id.* at 58.)

> a.  Admissibility of DiPaolo and Draper Deposition Testimony

In opposition to summary judgment, plaintiffs also rely on the testimony of two former

Lucky Strike employees who assert that Lucky Strike took steps to limit either the percentage of

black patrons allowed into Lucky Strike at any given time, or the visibility of the black patrons

who had been admitted to Lucky Strike.  Defendants assert that this testimony is largely

inadmissible hearsay, and in any event, vigorously deny that any such policy or practice existed.[5]

As discussed below, some of the testimony of these witnesses is admissible and only strengthens

plaintiffs' claims, while other portions are arguably relevant admissible and would do the same.

The Court will recount that testimony here, but does not rule on its admissibility or, more

important, rely on it in reaching its conclusions on summary judgment.

The first former employee is Nicholas DiPaolo, who was employed as head chef at

Lucky Strike Manhattan between October 2008 and June 2010.  (Van Leuven Dep. at 29.)

DiPaolo testified that Lucky Strike had an unwritten policy of admitting only a certain number of

black patrons on any given night in order to keep the percentage of black patrons under ten to

fifteen percent.  According to DiPaolo, he first heard a rumor of this policy from another member

---

[5] Defendants failed to raise these arguments until their reply memorandum, in complete disregard of the Court's instruction at a September 13, 2012 pre-motion conference that defendants specifically address the admissibility of this evidence in their papers.  Defendants' failure to address this issue deprived plaintiffs of fair notice of defendants' arguments until after plaintiffs had submitted their opposition brief, and consequentially prevented plaintiffs from responding to those arguments.  Although plaintiffs bear the burden of showing that their testimony is admissible at the summary judgment stage, *Solorio v. Asplundh Tree Expert Co.*, No. 02 Civ. 8035, 2009 WL 755362, at *1 (S.D.N.Y. Mar. 23, 2009), it would be unfair to allow defendants to raise complex new arguments after plaintiffs' opportunity to respond has passed, "thereby silencing [plaintiffs] on the issue and depriving the Court of [plaintiffs'] views on the question raised." *Playboy Enters. v. Dumas*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1347; *Fisher v. Kanas*, 487 F. Supp. 2d 270, 278 (E.D.N.Y. 2007); *see also Patterson v. Balsamico*, 440 F.3d 104, 113 n.5 (2d Cir. 2006).  This is particularly true where the Court explicitly directed defendants to address the issue, and defendants disregarded that instruction.

of the kitchen staff while working in a Lucky Strike in Philadelphia.  (DiPaolo Dep. (Doc. No. 26 Ex. E) at 62–63.)

DiPaolo further testified that, after moving to Lucky Strike Manhattan, the policy was confirmed in discussions with various employees of Lucky Strike, as follows.  In December of 2008, then-General Manager Doug Novatny told DiPaolo that Lucky Strike was "not supposed to be more than 15 percent black at any time."  (*Id.* at 62–63).  On an unspecified date, General Manager Richard Van Leuven told DiPaolo that he had heard directly from owner Steven Foster that Foster did not want more than 10 percent black patrons inside Lucky Strike at any time.  (*Id.* at 67, 87–91).  DiPaolo also overheard a conversation between Ray Van Cott, head of security for Lucky Strike, and Richard Van Leuven in which the two discussed the policy of limiting black patronage, and in which Van Cott instructed Bill Ginsberg, Vice President of Operations, to make sure he employed black door staff in order to disguise the race-based admission policy. (*Id.* at 115–17.)

DiPaolo also testified that, on Friday and Saturday nights, it was common to see a group of disgruntled African Americans standing outside Lucky Strike who had been denied entry because of the dress code, at least some of whom were dressed appropriately, while the inside of Lucky Strike was "pretty much all white."  (*Id.* at 63–64, 104–05.)

DiPaolo further testified that Richard Van Leuven told him that Ethan Hunt, a part owner of Lucky Strike Manhattan, denied Mr. Henry entry based on the fact that he was black.  (*Id.* at 175–76.)  DiPaolo also testified of his conversation with Van Leuven that Lucky Strike employed a policy of denying one member of a group admission to discourage the whole group from entering:

> I had asked him – I said, well, why didn't you let [Aubrey Henry] in?  And he goes, because he was black.  And he wanted to be a big shot.  So he told the one guy you're

dressed fine, you can come in.  And he told the other guy, you can't come in because he knows they're going to come in together or leave together.  So it's the perfect out to allow one entry and deny the other, they both have to leave.

(*Id.* at 176–77.)  DiPaolo was not working on the night that Aubrey Henry was denied admission to Lucky Strike and only learned of the incident later, and therefore lacks personal knowledge of the events surrounding Mr. Henry's being turned away from Lucky Strike.  (DiPaolo Dep. (Doc. No. 25 Ex. Q) at 9, 31–32.)

The second former employee is Michael Draper, a former bowling lane mechanic who worked at Lucky Strike between Fall 2008 and July 16, 2010.  (*See* Draper Dep. (Doc. No. 29 Ex. CC) at 71.)  Draper testified that, sometime in 2009, owner Ethan Hunt instructed him to set up construction barricades and pretend to perform maintenance on certain bowling lanes in order to keep black patrons away from the street-facing windows in Lucky Strike, so that people outside would not see the black patrons through the windows.  (*Id.* at 70–78.)  Draper was instructed to do this roughly once per week, but not every week.  (*Id.* at 78.)  Several weeks after receiving this instruction from Hunt, Draper complained about the matter to Bill Ginsberg via a letter (*see* Undated Letter from Michael Draper to Bill Ginsberg (Doc. No. 26 Ex. G)), but Ginsberg refused to discuss the matter with Draper.  (Draper Dep. at 91.)

Draper also testified that he heard Ricky Mercado (another Lucky Strike employee), Javier Caceres, Richard Van Leuven, and Ray Van Cott use the word "nigger" at least once each.  (*Id.* at 234–35, 237–38.)  Mercado and Caceres used the word in reference to a Lucky Strike employee; Van Leuven used it in reference to Mr. Henry; and Ray Van Cott referred to an 8-inch knife he carried in his boot as a "nigger sticker."  (*Id.* at 237–38.)  Draper also observed both black and white patrons wearing construction boots inside Lucky Strike.  (*Id.* at 235.)

Defendants vigorously deny that any practice or policy existed at Lucky Strike to limit the number of African American patrons or restrict them to certain areas, and maintain that they applied the dress code evenhandedly to patrons of all races.  (*See* Beauford Dep. at 84 (stating that there is no policy at Lucky Strike to limit the percentage of black people that are allowed in); Van Leuven Dep. at 58 (stating that the dress code is "a hundred percent evenhanded across the board, white, black, Hispanic or Asian" and that Van Leuven never had a conversation with anyone that worked for Lucky Strike regarding the dress code and race); Van Cott Dep. at 73 (stating that Van Cott never had discussions with anyone at Lucky Strike about the number of black people patronizing Lucky Strike); Hunt Dep. at 40 (stating that neither Hunt, nor anyone else at Lucky Strike, ever discussed the racial composition of the venue).)  Defendants also cite deposition testimony of several Lucky Strike employees who testified that no race-based policy existed.  (*See* Hanna Walis Dep. (Doc. No. 29 Ex. Y) at 57 (testifying that, as a waitress at Lucky Strike, Walis "[doesn't] think that Lucky Strike has a discriminatory policy" and that Lucky Strike is "very diverse.  It's every ethnicity, especially on weekends," and stating that "I would say on a given Friday or Saturday night, it would probably be close to fifty/fifty" African Americans."); Kaitlyn Rondolino Dep. (Doc. No. 29 Ex. Z) at 30–31 (stating that, as a party planner at Lucky Strike, she never heard any discussions regarding how many black people were allowed to enter Lucky Strike); Michael Draper Dep. (Doc. No. 29 Ex. AA) at 56–57 (stating that, as a mechanic, Draper was not aware of any policy that Lucky Strike had to limit the number of black patrons).)

Viewed most favorably to plaintiffs, if admissible, much of this testimony creates disputes of material fact on the issue of defendants' discriminatory intent.  Defendants argue that much of this evidence constitutes hearsay.  However, arguably, the testimony implicating Van

Leuven and Hunt could constitute party admissions and, if admissible and credited by the jury, is certainly powerful evidence of defendants' policies and practices relating to restricting admission of African-American patrons.  Moreover, DiPaolo's direct, personal observations observations of "disgruntled" minority patrons who had been denied entry ostensibly due to the dress code despite being properly attired, as well as Draper's observations of white patrons in the establishment wearing boots in violation of the dress code, are in no way hearsay, and are arguably relevant.

However, as noted, the Court need not rule on the admissibility of such evidence, or rely on it in addressing this motion as there is sufficient, independent evidence to sustain certain claims of discrimination as discussed below.

## PROCEDURAL HISTORY

On March 15, 2010, plaintiffs filed a notice of claim pursuant to New York Civil Rights Law ("NYCRL") § 41 with the Civil Rights Bureau of the New York State Attorney General's Office as well as the New York State Division of Human Rights.  (*See* Notice & Aff. of Service (Doc. No. 26 Ex. H).)  Also on March 15, 2010, plaintiffs commenced this lawsuit by filing their Verified Complaint in the Supreme Court of the State of New York, County of Kings.  (*See* Notice of Removal (Doc. No. 1) at 6.)  Plaintiffs bring claims pursuant to 42 U.S.C. §§ 1981, 1983, 1985, 1986, 1988, and 2000a, New York State Human Rights Law ("NYSHRL")[6] § 296, NYCRL § 40, New York City Human Rights Law ("NYCHRL")[7] § 8-107(4), and a claim for breach of contract.  Plaintiffs seek both monetary and equitable relief.

The Court held a pre-motion conference on September 13, 2012, at which time the Court granted defendants leave to move for summary judgment and instructed the parties to address the

---

[6] NY. Exec. Law § 296 *et seq.*

[7] N.Y.C. Admin. Code § 8–107(4).

admissibility of the DiPaolo and Draper testimony.  Defendants now move for summary

judgment (Docs. No. 25, 28), and plaintiffs oppose summary judgment.  (Doc. No. 26.)

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, depositions, interrogatories,

admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute

and that one party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue of material facts exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When determining whether a genuine issue of material fact exists, the evidence of the

nonmovant "is to be believed" and the court must draw all "justifiable" or reasonable inferences

in favor of the non-moving party.  *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144,

158–59 (1970)); *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004).  Nevertheless, once the

moving party has shown that there is no genuine issue as to any material fact and that it is

entitled to a judgment as a matter of law, "the nonmoving party must come forward with specific

facts showing there is a *genuine issue for trial.*"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted).  The non-moving party "may

not rely on conclusory allegations or unsubstantiated speculation."  *Scotto v. Almenas*, 143 F.3d

105, 114 (2d Cir. 1998).  In other words, the nonmovant must offer "concrete evidence from

which a reasonable juror could return a verdict in his favor."  *Anderson*, 477 U.S. at 256.  Where

"the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the

nonmovant fails to make a showing sufficient to establish the existence of an element essential to

[its] case."  *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322)

(internal quotation marks omitted).  Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case."  *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247–48).

## DISCUSSION

**I.    Claims Pursuant to 42 U.S.C. § 1981**

    a.    Legal Standard

        *i.    Scope of § 1981*

"In order to establish a claim based on [Section 1981], the plaintiff must show . . . that the defendant discriminated against him on the basis of race . . . that [the] discrimination was intentional . . . and that the discrimination was a 'substantial' or 'motivating factor' for the defendant's actions."  *Feacher v. Intercontinental Hotels Grp.*, 563 F. Supp. 2d 389, 401 (N.D.N.Y. 2008) (quoting *Tolbert v. Queens College*, 242 F.3d 58, 69 (2d Cir. 2001) (internal citations and quotations omitted)).  The discrimination must concern one of the activities enumerated in § 1981, which include the right to make and enforce contracts.  *Id.* (citing *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993)).  Section 1981(b) defines "make and enforce contracts" to include "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," and has been applied to claims arising from race-based denial of service at restaurants.  *Id.* (citing *Lizardo v. Denny's, Inc.* (*Lizardo I*), No. 97–CV–1234, 2000 WL 976808, at *3 (N.D.N.Y. July 13, 2000), *aff'd*, (*Lizardo II*) 270 F.3d 94, 101 (2d Cir. 2001)).

Outright refusals to serve willing customers based on their race, as well as placement of additional conditions on minority customers before serving them, constitute violations of § 1981

because those actions prevent minority customers from making contracts on the same terms as whites. *See, e.g., Solomon v. Waffle House, Inc.*, 365 F. Supp. 2d 1312, 1324 (N.D. Ga. 2004) ("[I]n light of the clear illegality of outright refusal to serve, a restaurant which wishes to discourage minority customers must resort to more subtle efforts to dissuade."); *Joseph v. New York Yankees P'ship*, No. 00 Civ. 2275, 2000 WL 1559019, at *3 (S.D.N.Y. Oct. 19, 2000) (holding that placing the "additional condition" of being forced to comply with a dress code on minority patrons while not enforcing that condition against non-minority patrons would violate § 1981 because plaintiff "would be limited in her right to contract as she could not enjoy 'all benefits, privileges, terms, and conditions of the contractual relationship' to the same extent as non-minority customers."); *Charity v Denny's Inc.*, No. 98-0554, 1999 U.S. Dist. LEXIS 11462 (E.D. La. July 26, 1999) ("a restaurant which opens itself to the public, offering food at set prices, is making an offer.  A customer who enters a restaurant and orders such food is accepting the offer, and thus forming a contract.  Upon eating the food and paying consideration for it, the customer effectively terminates the contractual relationship."); *McCaleb v. Pizza Hut of America, Inc.*, 28 F. Supp. 2d 1043, 1048 (N.D. Ill. 1998) (noting that a denial of service constitutes a violation of § 1981).  Negative treatment that falls short of an outright denial of service, however, presents a closer question, and compels the reviewing court to ask whether the negative treatment impaired plaintiffs' "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *See, e.g., Joseph*, 2000 WL 1559019, at *3 n.3 (noting that "[t]he courts that have considered whether assertions of mere delay suffice to make out a section 1981 claim are divided.")

Plaintiffs may rely on either direct or circumstantial evidence to show purposeful discrimination. *Shen v. A&P Food Stores*, No. 93 CV 1184, 1995 WL 728416, at *3 (E.D.N.Y.

Nov. 21, 1995).  Where, as here, plaintiffs' claim is based upon circumstantial evidence of discrimination, "the claim is reviewed under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)." *Feacher*, 563 F. Supp. 2d at 402 (quoting *Jones v. Western Suffolk Boces*, No. CV–03– 3252, 2008 WL 495498, at *5 (E.D.N.Y. Feb. 20, 2008)).

### ii.  *McDonnell-Douglas Burden Shifting Framework for § 1981 Claims*

"To establish a prima facie case of discrimination under § 1981, [p]laintiffs must demonstrate: (1) they are members of a racial minority; (2) they made themselves available to receive and pay for services ordinarily provided by [defendants] to all members of the public in the manner in which they are ordinarily provided; and (3) they did not enjoy the privileges and benefits of the contracted for experience under factual circumstances which rationally support an inference of unlawful discrimination in that (a) they were deprived of services while similarly situated persons outside the protected class were not deprived of those services and/or (b) they received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable." *Lizardo I*, 2000 WL 976808, at *3 & n.13 (quoting *Callwood v. Dave & Buster's, Inc.*, Nos. 98–1441, 98–887, 2000 WL 739257, at *13 (D. Md. June 7, 2000)); *see Mian*, 7 F.3d at 1087.[8]  "When plaintiffs seek to draw inferences of discrimination by showing that they were 'similarly situated in all material respects' to the individuals to whom they compare themselves, their circumstances need not be identical, but

---

[8] Courts in this circuit have applied slightly varying formulations of the standard for establishing a prima facie case. Compare *Joseph*, 2000 WL 1559019, at *2 *with Feacher*, 563 F. Supp. 2d at 402 *and Lizardo I*, 2000 WL 976808, at *3.  It appears that the Second Circuit has not explicitly set out the standard for stating a prima facie race discrimination claim pursuant to § 1981.  This Court therefore adopts the formulation contained in *Lizardo I* because, as the court in *Lizardo* noted, "this prima facie test provides the best mechanism for testing the merits of discrimination claims brought in the public-accommodations context," and also "addresses the elements of a § 1981 claim as set forth in [*Mian*, 7 F.3d at 1087]."  2000 WL 976808, at *3 & n.13.  Moreover, although the Second Circuit did not explicitly endorse the *Lizardo I* district court's formulation of the prima facie test, it did affirm the district court's decision and reasoning.  *See Lizardo II*, 270 F.3d at 101–05.

there should be a reasonably close resemblance of facts and circumstances." *Feacher*, 563 F. Supp. 2d at 402 (quoting *Lizardo II*, 270 F.3d at 101).

If plaintiffs establish a prima facie case, the burden shifts to defendants to articulate a legitimate, nondiscriminatory reason for the challenged conduct. *Lizardo I*, 2000 WL 976808, at *3 (citing *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir. 1997) (en banc), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)).  If defendants articulate a legitimate, nondiscriminatory reason, the presumption of discrimination disappears and plaintiffs must then carry their "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against" them. *Feacher*, 563 F. Supp. 2d at 402–03; *Lizardo I*, 2000 WL 976808, at *3.  Defendants will be entitled to summary judgment "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Feacher*, 563 F. Supp. 2d at 403 (quoting *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006)).  The court "must examine the entire record," including "the strength of the plaintiff's prima facie case, the probative value of the proof that the defendant's explanation is false, and any other evidence that supports the defendant's case" to determine whether plaintiffs have satisfied their ultimate burden of persuading the factfinder that defendants intentionally discriminated against them because of their race. *Id.* (quoting *Lizardo II*, 260 F.3d at 103). "[G]enerally, a plaintiff's prima facie case, combined with sufficient evidence to find the defendant's asserted justification false, may permit the trier of fact to conclude that the defendant unlawfully discriminated." *Lizardo I*, 2000 WL 976808, at *7 (quoting *Reeves*, 530 U.S. at 148).

    b. Aubrey Henry's Claim for Damages Pursuant to § 1981

Viewing the evidence in the light most favorable to plaintiff, a reasonable jury could find that plaintiff Aubrey Henry suffered discrimination, and his claim brought pursuant to section

1981 survives summary judgment.  There is no dispute with respect to the first two elements of his claim:  Henry is African-American and made himself available to receive services at Lucky Strike that are provided to all members of the public.  As to the inference of discrimination, there are material disputes of fact that require resolution by the factfinder, and, viewing the evidence as a whole in the light most favorable to Aubrey Henry, there is more than ample evidence in the record to support Mr. Henry's claim.

First, while it is undisputed that Mr. Henry was wearing Nike ACGs, the testimony conflicts as to how he was otherwise attired.  Moreover, Lucky Strike's door staff and management denied Mr. Henry admission because his footwear were considered construction or construction-type boots that the dress code prohibited, while Van Leuven testified that Henry was wearing loose-fitting, baggy clothing and a baseball cap in addition to the boots, and that any of those dress code violations alone would have been sufficient to deny him entry.  And there appears to be a dispute as to whether ACGs fall into the dress code's prohibited category of footwear.

Most important, plaintiffs have proffered sufficient evidence for a reasonable jury to conclude that Mr. Henry was turned away from Lucky Strike while similarly situated – in this case, similarly attired – white patrons were admitted.  *Lizardo*, 2000 WL 976808, at *4 (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)) ("To be 'similarly situated,' the individuals with whom [Henry] attempt to compare [himself] must be similarly situated in all material respects.")  As the testimony suggests, Mr. Henry, standing outside Lucky Strike, witnessed the door staff allow several white patrons wearing boots to enter.  When he inquired why those patrons were being admitted wearing the very type of footwear that the door staff claimed prevented him from entering, he was told "don't worry about them.  You're not

getting in" – a response that could reasonably be taken to indicate that Henry was being denied

entry for reasons other than his footwear.  In addition, Lloyda Henry and Karen Jemmott testified

that they saw white male patrons wearing construction boots inside Lucky Strike.  This evidence

alone is sufficient to convince a reasonable jury that Mr. Henry was denied the right to contract

for Lucky Strike's services on the same terms as whites, and that the denial took place under

circumstances giving rise to an inference of discrimination.  *See Barry v. Delta Airlines, Inc.*,

No. CV–02–5202, 2009 WL 3260499, at *8–10 (E.D.N.Y. Oct. 9, 2009) (holding that Sri

Lankan plaintiff raised fact issue on § 1981 national origin discrimination claim by presenting

testimony that white passengers were allowed to carry bags onto plane but that plaintiff was not

allowed to carry his bag on); *Feacher*, 563 F. Supp. 2d at 403 (holding that black plaintiffs'

testimony that they were denied entrance into a restaurant but that two Caucasian couples were

seated, combined with employee's statement "we're closed for you," gave rise to inference of

discrimination);[9] *Williams v. Thant Co.*, No. 02–1214, 2004 WL 1397554, at *2–3 (D. Or. June

22, 2004) (holding that black patrons who were denied entry to restaurant because their jeans

were too baggy in violation of dress code raised fact issue on § 1981 claim based on testimony

that white patrons were admitted whose jeans were just as baggy as plaintiffs'); *Joseph*, 2000

WL 1559019, at *2–5 (holding that black woman who was denied entry to a restaurant based on

her dress, but was later admitted after changing her clothing, established a fact issue because she

presented testimony that white patrons were admitted who were in violation of restaurant's dress

code).

---

[9] Defendants attempt to distinguish *Feacher* on the ground that, after the *Feacher* plaintiffs were initially denied service, defendants exhibited egregious, direct evidence of racial prejudice.  However, the court in *Feacher* held that the above-recited facts were sufficient to give rise to an inference of discrimination without reference to the more egregious behavior that took place later.  *See* 563 F. Supp. 2d at 403–04.

Although defendants have satisfied their minimal burden of asserting a legitimate, non-discriminatory reason for denying Mr. Henry admission to Lucky Strike – his alleged noncompliance with the dress code – defendants' reason does not overcome plaintiffs' evidence establishing an inference of discrimination.  Aubrey Henry has, on the basis of the entire record, raised a fact issue regarding his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against" him by presenting evidence sufficient to raise doubt concerning defendants' legitimate, nondiscriminatory explanation.  *Feacher*, 563 F. Supp. 2d at 402–03; *see Reeves*, 530 U.S. at 148;  *Lizardo I*, 2000 WL 976808, at *7 ("[G]enerally, a plaintiff's prima facie case, combined with sufficient evidence to find the defendant's asserted justification false, may permit the trier of fact to conclude that the defendant unlawfully discriminated.")

Defendants put forward a number of arguments to establish that plaintiffs' evidence does not allow an inference of discrimination, but none of those arguments is persuasive.  Defendants argue that Mr. Henry's ACGs violated their dress code by presenting testimony that Lucky Strike staff understood the term "construction boots" to include ACGs, as though this were the end of the matter.  However, whether ACGs are construction boots, and therefore prohibited by Lucky Strike's dress code, is not an appropriate question for this Court to resolve on summary judgment, and is indeed irrelevant if Lucky Strike was in fact admitting white patrons in construction boots (which unquestionably violate the dress code) while turning Mr. Henry away.

Defendants also argue that the photographs taken by Jemmott fail to show the race of the other patrons wearing construction boots, and therefore cannot support an inference of race discrimination.[10]  This argument is entirely beside the point: At the summary judgment stage, it

---

[10] Defendants further argue that the photographs are inadmissible, but provide no legal basis for that assertion.  The Court need not rule on the admissibility of the photographs at this time because, for the reasons described above,

is sufficient that plaintiffs have presented testimony that similarly situated white patrons were admitted to Lucky Strike – plaintiffs obviously need not present photographic evidence to corroborate that testimony.[11]

For these reasons, Aubrey Henry's claim of discrimination brought pursuant to section 1981 survives summary judgment.

c.  Section 1981 Claims of Lloyda Henry and Karen Jemmott

The section 1981 claims of Lloyda Henry and Karen Jemmott do not fare as well. Neither woman was personally denied admission or service at Lucky Strike, and as such, neither was denied "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" with Lucky Strike, a central element of a § 1981 claim.[12] § 1981(b); *see Feacher*, 563 F. Supp. 2d at 401 ("Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or

---

plaintiffs have presented sufficient evidence to survive summary judgment with respect to their § 1981 claim even without relying on the photographs.

[11] Defendants also argue that there is no basis for liability against Caceres and Van Leuven because there is no evidence demonstrating that they intentionally discriminated against Mr. Henry.  However, plaintiffs have presented sufficient evidence to demonstrate that both Caceres and Van Leuven were personally involved in the decision to deny Mr. Henry entrance in to Lucky Strike while allowing white patrons who were allegedly improperly attired to remain in the establishment and obtain services.

[12] The parties frame their discussions of Jemmott and Lloyda Henry's claims in terms of standing, with defendants arguing that they lack standing because they suffered no injury-in-fact.  The real issue in dispute, however, is whether Jemmott and Lloyda Henry were deprived of a right protected by § 1981.  Indeed, at least two other courts have noted that the relevant issue is the same regardless of whether it is framed in terms of "standing" or "ability to state a claim."  *Bartley v. Virgin Grand Villas*, 197 F. Supp. 2d 291, 294 (D. V.I. 2002) ("Because the defendants' argument with respect to Bartley's standing to assert a Title II claim turns on the scope of the statute itself, I will analyze this issue in terms of whether Bartley has stated a cause of action under 42 U.S.C. § 2000a."); *Westray v. Porthole Inc.*, 586 F. Supp. 834, 836, 839 (D. Md. 1984) (noting, with respect to both § 1981 and § 2000a claims, that "[a]lthough the parties have argued in terms of standing this issue can be analyzed as to whether the white plaintiffs have stated a claim for relief under 42 U.S.C. § 1981.  'Whether the answer is labeled standing or cause of action, the question is whether the statute or constitution authorizes the plaintiff to sue.'").  Because the framework of ability to state a claim provides a more useful context for evaluating plaintiffs' claims on this record, the Court chooses to apply that framework here.

20

proposed contractual relationship.") (quoting *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006)).  For the reasons discussed below, their claims fail as a matter of law.

Lloyda Henry was admitted into Lucky Strike, and at no time did any member of the door staff indicate that she would not be allowed inside.  It was her understanding from the outset that she was allowed to enter and patronize Lucky Strike, notwithstanding the fact that her husband was not being admitted.  *See Morris v. Office Max, Inc.*, 89 F.3d 411, 414 (7th Cir. 1996) (holding that plaintiffs failed to raise fact issue on § 1981 claim although defendant called police to question them, because plaintiffs were not denied admittance or service, were not asked to leave, and ultimately made a purchase; also rejecting plaintiffs' claim that they would have made another purchase had defendants not discriminated because "[a] claim for interference with the right to make and enforce a contract must allege the actual loss of a contract interest, not merely the possible loss of future contract opportunities."); *O'Haro v. Bob Evans Farms, Inc.*, No. 1:09–CV–00340, 2010 WL 4942219, at *6–9 (M.D. Pa. Oct. 4, 2010) (holding that, although plaintiffs raised an inference of discriminatory intent based on race, they were not deprived of any rights under § 1981 by defendant restaurant because plaintiffs were seated and eventually offered service); *Stearnes v. Baur's Opera House, Inc.*, 788 F. Supp. 375, 377–78 (C.D. Ill. 1992) (holding that bar patron's civil rights were not violated because he was not denied admittance to the bar or service while at the bar).

Moreover, once Lloyda Henry was admitted to Lucky Strike, she was not denied service, nor was her ability to obtain service impaired in any way.  In fact, Mrs. Henry never sought to be served inside Lucky Strike, and nothing in the record suggests that it was Lucky Strike's action – rather than Lloyda Henry's own decision – not to order food or drinks or participate in Jemmott's party.  On the contrary, the fact that Mrs. Henry left when it became apparent that her

21

husband would not be admitted bolsters Lucky Strike's claim by demonstrating that Mrs. Henry

never sought service from Lucky Strike at all.  *See O'Haro*, 2010 WL 4942219, at *8

("[Plaintiffs] admit that they never asked anyone for a drink, for a meal, or for any food.

Plaintiffs' refusal to stay and eat at defendant's restaurant is not equivalent to the actual denial or

impairment of a contractual relationship"); *Pierre v. JC Penney Co., Inc.*, No. 03-4782, 2006 WL

407553, at *5–6 (E.D.N.Y. Feb. 21, 2006) ("The proposed plaintiffs do not allege that they even

attempted to make a purchase, much less that they were actually denied the opportunity to make

a purchase by the defendant."); *Bagley v. Ameritech Corp.*, No. 99 C 1449, 1999 WL 1069113,

at *4–5 (N.D. Ill. Nov. 17, 1999) (holding that plaintiff was not deprived of § 1981 rights when

he left the store after hearing a perceived racist comment without seeking to purchase any

products or requesting assistance).

Even assuming that Lucky Strike, by denying Aubrey Henry entry, also intended to

discriminate against Lloyda Henry, Lloyda Henry did not suffer a deprivation of her rights

pursuant to section 1981.[13]  Without a showing that Lucky Strike somehow prevented Lloyda

Henry herself from contracting for its services on the same terms as white patrons, there is no

evidence to support Mrs. Henry's section 1981 claim, no matter how objectionable Lucky

Strike's treatment of her husband was.  *See Morris*, 89 F.3d at 414; *Solomon*, 365 F. Supp. 2d at

1322–24 (holding that plaintiffs who received service and food may have experienced

discrimination, but that their rights under section 1981 were not violated); *Bobbitt v. Rage Inc.*,

19 F. Supp. 2d 512, 517–18 (W.D. N.C. 1998) (holding that plaintiffs who were subjected to

---

[13] Plaintiffs point to DiPaolo's testimony to suggest that defendants excluded Aubrey Henry with the intent of discouraging all members of the group from entering Lucky Strike.  Even if such a policy existed, it would suggest only discriminatory intent and would not demonstrate an impairment of contract rights, and therefore would not violate § 1981.  *See Morris*, 89 F.3d 411, 414; *O'Haro*, 2010 WL 4942219, at *6–9; *Solomon*, 365 F. Supp. 2d at 1322–24; *Bobbitt*, 19 F. Supp. 2d at 517–18.  For an additional discussion of DiPaolo's testimony, see *infra* section I.d & n.14.

delay, had to retrieve their own menus, were not served until after white patrons were served, and were unsatisfied with the food they were served failed to state a claim under § 1981 because they were not denied admittance or service and were not asked to leave, but merely experienced "poor service with racially discriminatory animus").

Similarly, Jemmott cannot sustain a claim under section 1981.  Jemmott and McKinney were admitted to Lucky Strike without incident, attended the party with the rest of their guests as planned, and experienced no other problems for the remainder of the evening.  Moreover, Lucky Strike compensated her for the hour of time that her party was delayed while she attempted to negotiate Aubrey Henry's entry.  Because she was admitted and served, and not subjected to any treatment that could possibly constitute an impairment of her right to contract with Lucky Strike, Jemmott has failed to establish a section 1981 claim.  *See Solomon*, 365 F. Supp. 2d at 1322–24; *Harrison v Denny's Restaurant, Inc.*, No. C–96–0343, 1997 WL 227963, at *4 (N.D. Cal. Apr. 24, 1997) (holding that slow service does not amount to a civil rights violation); *Robertson v. Burger King, Inc.*, 848 F. Supp. 78, 81 (E.D. La. 1994) (same); *Stearnes*, 788 F. Supp. at 377–78 (holding that bar patron's civil rights were not violated because he was not denied admittance to the bar or service while at the bar).

Thus, the statute and caselaw are clear that there can be no § 1981 claim without conduct that impairs "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  On this record, neither Lloyda Henry nor Karen Jemmott suffered any such impairment, and their section 1981 claims must be dismissed.

      d.   State and City Claims of Discrimination

The parties agree that plaintiffs' claims pursuant to NYCRL § 40, NYSHRL § 296, and NYCHRL § 8-107(4) are analyzed identically to their section 1981 claims.  *Whitehurst v. 230*

23

*Fifth, Inc.*, No. 11 Civ. 0767, 2011 WL 3163495, at \*9 (S.D.N.Y. July 26, 2011) (noting that discrimination claims pursuant to section 1981, NYSHRL 296, NYCRL § 40, and NYCHRL § 8-107(4) are analyzed under the same standard); *Drayton v. Toys "R" Us Inc.*, 645 F. Supp. 2d 149, 163–64 (S.D.N.Y. 2009) (noting that claims under § 1981, NYSHRL § 296 and NYCRL § 40 are analyzed identically); *Howe v. Town of Hempstead*, No. 04 Civ. 0656, 2006 WL 3095819, at \*5 (E.D.N.Y. Oct. 30, 2006) (noting that § 1981, NYSHRL § 296, and NYCRL § 40 "all undergo essentially the same analysis").  Therefore, for the reasons discussed in connection with plaintiffs' section 1981 claims, the state and city claims are dismissed as to Lloyda Henry and Karen Jemmott, but survive as to Aubrey Henry.

e.   Plaintiffs' Claims for Injunctive Relief

Plaintiffs also seek injunctive relief under section 1981, as well as under the analogous state and city discrimination provisions.  Again, the parties agree that the legal analysis on summary judgment is the same under each of these statutes.

In order to demonstrate that they have standing to pursue claims for injunctive relief, plaintiffs must "show a 'real and immediate threat of repeated injury.'"  *Joseph*, 2000 WL 1559019, at \*5 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)); *Freydel v. New York Hosp.*, No. 97 CIV. 7926, 2000 WL 10264, at \*2 (S.D.N.Y. Jan. 4, 2000).  Plaintiffs "must set forth the likelihood of a future encounter with the defendant which is likely to lead to a similar violation of some protected right."  *Joseph*, 2000 WL 1559019, at \*5 (citing *Lyons*, 461 U.S. at 105–06); *Freydel*, 2000 WL 10264, at \*2.

Plaintiffs have presented no evidence that there is any likelihood that they will be discriminated against by Lucky Strike or its employees in the future.  Plaintiffs therefore lack standing to assert a claim for injunctive relief pursuant to § 1981, and summary judgment is

24

granted thereon with respect to all plaintiffs.  *See Joseph*, 2000 WL 1559019, at *5; *Freydel*,

2000 WL 10264, at *2–4; *Jackson v. Waffle House, Inc.*, 413 F. Supp. 2d 1338, 1362–63 (N.D.

Ga. 2006) (holding that one plaintiff had standing to sue for injunctive relief because she had

dined in a Waffle House since the alleged discriminatory incident, and another plaintiff had

standing to sue for injunctive relief because he submitted a declaration stating that he would

return to Waffle House if Waffle House amended its policies); *Solomon*, 365 F. Supp. 2d at

1330–31 (holding that plaintiffs who testified that they would return to Waffle House if Waffle

House changed its allegedly discriminatory policies had standing to sue for injunctive relief).

## II.    Claims Pursuant to  42 U.S.C. § 2000a

Plaintiffs advance claims for monetary relief pursuant to 42 U.S.C. § 2000a.  That

remedy is unavailable as the statute provides solely for injunctive relief.  § 2000a-3; *Feacher*,

563 F. Supp. 2d at 401 n.10 (citing *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402

(1968)).  The Court would ordinarily allow plaintiffs to amend their complaint to seek the proper

relief; however, such an amendment would be futile here because, for the reasons discussed

above, plaintiffs lack standing to seek injunctive relief.  *See* Fed. R. Civ. P. 15(a); *Lucente v.

IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2003) (noting that it is appropriate to deny leave to

amend when the proposed amendment would be futile).  Summary judgment is therefore granted

against all plaintiffs with respect to claims brought pursuant to section 2000a.

## III.    Claims Pursuant to 42 U.S.C. § 1983

Though pled in the complaint, plaintiffs do not address their section 1983 claim in their

memorandum in opposition to summary judgment.  Thus, the Court deems those claims

abandoned.  *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal

courts may deem a claim abandoned when a party moves for summary judgment on one ground

and the party opposing summary judgment fails to address the argument in any way.") (citing *Douglas v. Victor Capital Grp.*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998)).  In any event, summary judgment is warranted because there is no evidence that any defendant acted under color of state law.  *See* 42 U.S.C. § 1983; *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012); *McCluskey v. New York State Unified Court Sys.*, 442 Fed. App'x 586, 589 (2d Cir. 2011).

## IV.    Claims Pursuant to 42 U.S.C. §§ 1985(3), 1986, and 1988

To state a claim under § 1985(3), plaintiffs must present evidence of (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to plaintiffs' person or property, or a deprivation of a right or privilege of a citizen of the United States.  *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (citing *Traggis v. St. Barbara's Greek Orthodox Church*, 851 F.2d 584, 586–87 (2d Cir. 1988)).

Plaintiffs cannot establish the first element of their § 1985(3) claim because the intracorporate conspiracy doctrine precludes any finding of a conspiracy among Lucky Strike employees.  "Under the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together."  *Nassau Cnty. Employee "L" v. Cnty. of Nassau*, 345 F. Supp. 2d 293, 304 (E.D.N.Y. 2004) (quoting *Quinn v. Nassau Cnty. Police Dep't*, 53 F. Supp. 2d 347, 359 (E.D.N.Y. 1999)).  Because all defendants were employees of Lucky Strike acting within the scope of their employment, there can be no conspiracy among them.  *See Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 465–66 (S.D.N.Y. 2012) (finding intracorporate conspiracy doctrine applicable because "defendants here were all employees of the same employer . . . undertaking acts within the scope of their employment.");  *Tardd v. Brookhaven Nat. Lab.*, 407 F. Supp. 2d 404, 414–16 (E.D.N.Y. 2006) (finding

intracorporate conspiracy doctrine applicable to § 1985(3) claim because "[a]ll of the individual defendants are employees of a single entity").

Moreover, no exception to the intracorporate conspiracy doctrine applies here.  An exception exists if defendants are "pursuing personal interests wholly separate and apart from the entity," *Tardd*, 407 F. Supp. 2d at 414, but there is no evidence that defendants were pursuing personal interests when they denied Mr. Henry admission.  Plaintiffs argue that another exception exists "where continuing, separate instances of discrimination [or misconduct] are alleged."  *See, e.g.*, *Dilworth*, 914 F. Supp. 2d at 466–67.  However, this exception has been repudiated by the very court that initially recognized it, *id.* at 467 ("The Seventh Circuit has since explicitly renounced the notion that there is a "multiple acts" exception to the intra-corporate conspiracy doctrine"), and this Court rejects any purported "multiple acts" exception. *Id.* (quoting *Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108, 111 (7th Cir. 1990), and collecting cases).  Moreover, even if the Court were to recognize such an exception, it would not apply here, where plaintiffs' claim is based upon a single allegedly discriminatory act – the act of denying Mr. Henry admission to Lucky Strike – rather than a continuing pattern of discriminatory acts.

Summary judgment is therefore granted against all plaintiffs with respect to the § 1985(3) claim.  Summary judgment is also granted against all plaintiffs on the § 1986 claim because such a claim "must be predicated on a valid § 1985 claim," *Brown v. City of Oneonta, New York*, 221 F.3d 329, 341 (2d Cir. 1999), and with respect to the § 1988 claim because that section does not provide an independent cause of action, but merely allows for an award of attorneys' fees.  *See Weiss v. Violet Realty, Inc.*, 160 Fed. App'x 119, 120 (2d Cir. 2005) (affirming dismissal of § 1988 claim because that section "does not provide an independent cause of action.").

V.   **Breach of Contract Claims**

All plaintiffs also assert claims for breach of contract.  However, plaintiffs' opposition to defendants' motion is devoid of legal citation or reasoning, consisting only of the conclusory statement that Lucky Strike breached its contract with Jemmott by denying "several" of her guests entrance on account of their race.  Putting aside the fact that only one guest was denied admission to Lucky Strike, plaintiffs have presented no legal arguments explaining how defendants' actions constituted a breach of the contract.  Because plaintiffs merely rely on a conclusory assertion of liability, the Court deems the breach of contract claim abandoned and grants summary judgment thereon.  *See Taylor*, 269 F. Supp. 2d at 75 (citing *Douglas*, 21 F. Supp. 2d at 393).

In any event, this claim is without merit.  In order to establish a breach of contract under New York law, a plaintiff must establish:  "1) the making of a contract, 2) plaintiffs' performance of the contract, 3) defendants' breach of the contract and 4) damages suffered by the plaintiff."  *Karmilowicz v. Hartford Fin. Servs. Grp.*, No. 11 Civ. 539, 2011 WL 2936013, at *6 (S.D.N.Y. July 14, 2011), *aff'd*, 494 Fed. App'x 153 (2d Cir. 2012) (quoting *Baraliu v. Vinya Capital, L.P.*, No. 07 Civ. 4626, 2009 WL 959578, at *5–6 (S.D.N.Y. 2009)).  In addition, "a plaintiff must prove the existence of damages with certainty in order to recover for breach of contract."  *D'Andrea v. Rafla-Demetrious*, 3 F. Supp. 2d 239, 246 (E.D.N.Y. 1996) (citing *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 852 (2d Cir. 1987)).  "Moreover, New York law 'does not countenance damage awards based on speculation or conjecture.'"  *Id.* (quoting *Wolff & Munier, Inc. v. Whiting–Turner Contracting Co.*, 946 F.2d 1003, 1010 (2d Cir. 1991)).

Plaintiffs Aubrey and Lloyda Henry cannot establish the first element of a breach of contract claim – the making of a contract – because they never entered into a contract with

28

Lucky Strike.  Summary judgment is therefore granted against these plaintiffs on the breach of contract claim.

Plaintiff Jemmott has failed to present facts sufficient to demonstrate that refusing Mr. Henry admission constituted a breach of her agreement with Lucky Strike.  Nothing in the event order, or in the record, establishes that Jemmott possessed a contractual right to have Aubrey Henry admitted as her guest.  Moreover, Jemmott has not demonstrated  that she suffered any damages.  Although Jemmott spent part of her party negotiating with Lucky Strike for Aubrey Henry's entry, Lucky Strike compensated her for this time, and Jemmott ultimately received a two-hour long party as specified in the event order.  Jemmott was therefore made whole, and suffered no damages.  *See Pollock v. Trustmark Ins. Co.*, 367 F. Supp. 2d 293, 297 (E.D.N.Y. 2005) ("In a breach of contract action in New York, the measure of damages is compensatory, that which the plaintiff needs to be made whole.") (citing *Scalp & Blade, Inc. v. Advest, Inc.*, 765 N.Y.S.2d 92, 97 (4th Dep't 2003)).  The fact that the birthday party did not proceed precisely according to plan does not mean that Jemmott suffered damages sufficient to sustain a claim for breach of contract.  *See D'Andrea*, 3 F. Supp. 2d at 246–47 (holding that no fact issue existed with respect to damages when plaintiff, alleging that medical residency program issued him a certificate that omitted certain necessary language, nonetheless obtained employment and "failed to show that he was denied any of the privileges or benefits associated with satisfactory completion of a residency program.").  Finally, Jemmott cannot recover damages for emotional and mental distress, damage to reputation, or punitive damages under a breach of contract claim.  *Id.* at 247 (citing *V.S. Int'l, S.A. v. Boyden World Corp.*, No. 90–CV–4091, 1993 WL 59399, at *6  (S.D.N.Y. Mar. 4, 1993)).  Thus, Jemmott's breach of contract claim fails as a matter of law.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is DENIED with respect to plaintiff Aubrey Henry's claims for discrimination pursuant to 42 U.S.C. § 1981, NYSHRL § 296, NYCRL § 40, and NYCHRL § 8-107(4).  Defendants' motion is GRANTED with respect to all other claims, including all claims brought by plaintiffs Lloyda Henry and Karen Jemmott.

SO ORDERED.

DATED:  Brooklyn, New York
           September 1, 2013                    *Roslynn R. Mauskopf*
                                             _____
                                             ROSLYNN R. MAUSKOPF
                                             United States District Judge

30